Karen E. Wentzel (SBN 112179)
DORSEY & WHITNEY LLP
1717 Embarcadero Road
Palo Alto, California 94303
(650) 857-1717 : phone
(650) 857-1288 : fax
Email: efilingPA@dorsey.com

Edward B. Magarian (admitted *pro hac vice*)
Zeb-Michael Curtin (admitted *pro hac vice*)
DORSEY & WHITNEY LLP
Suite 1500, 50 South Sixth Street
Minneapolis, Minnesota 55402
(612) 340-2600 : phone
(612) 340-2777 : fax
Email: magarian.edward@dorsey.com
        curtin.zeb@dorsey.com

Attorneys for Defendant
AMERIPRISE FINANCIAL
SERVICES, INC.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SYLVIA JOHNSON, individually, and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> AMERIPRISE FINANCIAL SERVICES, INC., <br><br> Defendants. | Case No. C 07-03168 PJH/JL <br><br> **DECLARATION OF ZEB-MICHAEL CURTIN** |

STATE OF MINNESOTA   )
                     )
COUNTY OF HENNEPIN   )

I, Zeb-Michael Curtin, declare:

1. I am an attorney with the law firm of Dorsey & Whitney LLP, counsel of record for Defendant in the above-captioned action. I submit this Declaration in support of Defendant's

Reply Memorandum Regarding Motion for Order Regarding Discovery Pursuant to Federal Rules of Civil Procedure 23(d) and 26(c).

2. Attached hereto as Exhibit A is a true and correct copy of Ameriprise Financial's Financial Advisor's Agreement governing its employment relationship with P1 Employee Advisors.

3. Attached hereto as Exhibit B is a true and correct copy of excerpts of Ameriprise Financial's Independent Advisor Business Franchise Agreement, which governs the franchise affiliations of P2 Independent Advisors.

I declare under penalty of perjury that the foregoing is true and correct. Signed at Minneapolis, Minnesota, this 27th day of February, 2008.

s/Zeb-Michael Curtin
Zeb-Michael Curtin

# Ameriprise Financial Services, Inc.

## Financial Advisor's Agreement

This is an Agreement, made at Minneapolis, Minnesota, by and between Ameriprise Financial Services, Inc., its affiliated insurance agencies, IDS Life Insurance Company and IDS Life Insurance Company of New York (collectively "Company") and you,

(Print Full Name)

executed and effective as of the date shown on the last line of this Agreement. It defines your relationship with Company as a Financial Advisor. Both you and Company promise to comply with the terms of this Agreement and any properly executed Riders to this Agreement.

### Section I — Definitions

1. For purposes of this Agreement, the terms listed below have the special meanings shown.
   (a) "Company" means Ameriprise Financial Services, Inc., its affiliated insurance agencies, IDS Life Insurance Company and IDS Life Insurance Company of New York.
   (b) "IDSL-NY" means IDS Life Insurance Company of New York.
   (c) "Affiliate" means any partnership, business, trust, company or corporation affiliated with Company at any time while this Agreement is in effect.
   (d) "Financial Advisor" or "Advisors" means a Financial Advisor employed by Company.
   (e) "Service Date" means date of hire by Company.
   (f) "Certificates" means the face amount Certificates of Ameriprise Certificate Company and contractual plan Certificates of any other contractual plan.
   (g) "Stock" means the capital Stock of registered investment companies.
   (h) "Services" means financial planning, advisory, securities brokerage, tax or other financial Services.
   (i) "Products" means Certificates, Stock, other securities or investments, lending products, life insurance and annuity policies and contracts, and other insurance products.
   (j) "Issuer" means the company or entity that issues a Product or Service distributed or offered by Company itself or by Company as the agent of another company or as the branch manager of IDSL-NY.
   (k) "Records and Materials" means all records, files, manuals, blanks, forms, materials, supplies, stationery, literature, seminar materials, training materials, computer software, licenses, papers and books that Company, an Affiliate or an Issuer furnishes or leases to you for use, with or without charge, or that you create or prepare, including notes, memos and works of authorship, in connection with the performance of this Agreement.
   (l) "Service Period" means any two-week period coinciding with Company's regular biweekly compensation period for Financial Advisors.
   (m) "Compensation Plan" means the rules, policies and schedules as amended and published from time to time that are related to the payment of salaries, bonuses, and other fees and compensation.
   (n) "Client" means a person or entity who (1) purchases or holds a Product or Service acquired from or through Company or an Affiliate or one of their employees or any other person selling or distributing Products or Services offered by the Company or its Affiliates with the consent of Company or the Affiliate, or (2) authorizes Company, an Affiliate or one of their employees or any other person selling or distributing Products or Services offered by the Company or its Affiliates to make personal financial planning presentations to it or its employees or members, or (3) is a member of a Client's household.

### Section IIA — Appointment

1. Through this Agreement, Company appoints you to seek applications for insurance policies and annuities designated by Company and applications and Clients for the Products and Services distributed or offered by Company in the territory assigned to you, but without exclusive rights in that territory. You also are appointed to collect payments on those Products and Services. You accept this appointment and will:
   (a) Before seeking any applications from any Clients for Products and Services, comply with Company policies related to Client contacts and obtain any licenses or registrations required by law or Company and a surety or fidelity bond satisfactory to Company and will maintain them in force until this Agreement is terminated.
   (b) In dealing with Clients or prospective Clients, explain the terms of Products or Services fully; make no untrue statements; and state all relevant facts.
   (c) Comply with all laws, ordinances, regulations and Company policies that apply to your activities.
   (d) Promptly deliver premium receipts and policies or contracts originating from applications solicited for life insurance and annuities, but only when applicant appears to be in good health and the initial premium (if required) has been duly paid, and other receipts and policies or contracts as required by Company or Issuer.
   (e) Collect and immediately report and remit to Company or Issuer any initial premiums or any payments you receive for Products or Services and any other money or property you receive on behalf of Company.
   (f) Send the payments, money or property you collect to Company without commingling it with your own money or property.
2. You cannot alter or change the provisions of any Product or Service distributed by Company or through the Company field force. You also cannot incur any liability or expense on behalf of Company or any Issuer.

28028 D (9/05)

EXHIBIT A

3. Any application for a Product or Service and any business that you submit is subject to acceptance or rejection by the corporate office of Company in Minneapolis, Minnesota and the Issuer.
4. In states where Company is authorized to conduct business as an insurance agent, you must follow Company's rules and policies for seeking applications for annuity contracts and insurance policies.
5. If you are registered in Wisconsin, you will be considered an "agent" as defined in Section 551.02(2) of the Wisconsin statutes, regardless of any provisions of this Agreement to the contrary.
6. This Agreement authorizes you to solicit applications for insurance policies or annuities issued by IDSL-NY if you have executed a separate Rider hereto authorizing such activity or if you are assigned to an area office in the State of New York and, in either case, are licensed as an agent of IDSL-NY. Even if you meet those conditions, you cannot solicit applications for insurance or annuities of IDSL-NY, other than annuities which are registered under the Federal Securities Laws, unless you qualify as a "new agent" within the meaning of Regulation 50 of the New York Insurance Department.

### Section IIB — Work Responsibilities

1. You agree to devote all of your working time and effort, to the best of your abilities, to performing your duties under this Agreement for Company and any Riders to this Agreement or any agreement with an Affiliate. You also agree not to engage in any other employment, occupation or business enterprise unless it is with an Affiliate.
2. You agree to abide by all policies of Company, including but not limited to the Ameriprise Financial Code of Conduct, the Client Relations Guide and the Individual Treatment Policy.

### Section III — Compensation

1. You will be provided compensation in accordance with the rules and policies established by the Company and in accordance with applicable law. You understand the Company may in its sole discretion amend or modify its compensation policies or plans from time to time. Any compensation paid will constitute payment in full for all services rendered to the Company.
2. In addition to other appropriate legal remedies, Company has the right to apply any amount payable to you by Company against any debt you owe Company or an Affiliate or Issuer.
3. Company may charge you and your compensation for any amounts advanced to you, any amounts paid on your behalf or any amounts charged to you under this Agreement.
4. When this Agreement ends, you must pay, on demand, any debt you owe Company. Payment is required whether the debt is for charges made before or after this Agreement terminates. You agree to and authorize the assignment of any debt you owe Company to any Affiliate. You also agree to repay any assigned debt to the assignee.
5. Except for clerical error and undisclosed material facts, the regular compensation statement Company issues to you is considered to be an accurate and complete record of all the amounts Company owes you. Settlement on the basis of these regular statements constitutes full satisfaction and agreement between you and Company about the amounts defined just above. The only exceptions occur in the case of a claim to the contrary made within 60 days after the statement is issued, clerical error or undisclosed material fact.

### Section IV — Restrictions on Your Activities

1. "Using Information You Acquire"
    (a) All Records and Materials are the property of the Company, an Affiliate or one of their associated companies. All rights to Records and Materials that you prepare or create in connection with the performance of this Agreement are hereby assigned to the Company. You agree that you will not reproduce or allow the reproduction of the Records and Materials in any manner whatsoever, except pursuant to written policy or consent of the Company.
    (b) You are responsible for the safekeeping of these items. Such Records and Materials are open to inspection by the Company at any time. You must return them and all copies of them to the Company at any time on request. When this Agreement ends, all of these items remain the Company's property. You must return all of them, together with any licenses you have or control, without demand or compensation.
    (c) While this Agreement is in effect and after it ends, you agree that you will not reveal the contents of any Company property or allow them to be revealed, except in connection with carrying out your duties under this Agreement. You will not reveal the names and addresses of Company Clients or any other information about them, including financial information. You also will not reveal any of this information about potential Clients, to whom a presentation has been made by an employee or any other person selling or distributing Products or Services offered by the Company or its Affiliates, who might reasonably be expected to do business with the Company or an Affiliate. You will not allow any of this information about Clients or potential Clients to be revealed.
    (d) You agree that the identity of Clients and potential Clients is confidential information and a "trade secret" as defined by law. For one year after this Agreement ends, you agree not to use any such information in connection with any business in competition with the Company or an Affiliate.
    (e) You specifically acknowledge that, pursuant to this Agreement, you will receive valuable and confidential trade secret information, including, without limitation, information regarding the operational, sales, promotional, and marketing methods and techniques of Company. In recognition and in consideration for those and other benefits, to protect the confidentiality of Company's Client information and to protect Company's goodwill, you covenant that (a) during the term of this Agreement and (b) for one year after the expiration or termination of this Agreement in the geographic area within one hundred (100) miles of the office from which you operated, you shall not, either directly or indirectly, for yourself or through, on behalf of, or in conjunction with any person or entity:

(1) Encourage, assist, participate, induce, receive compensation for, or attempt to induce any Client or prospective business or customer to terminate an agreement with Company, Company's Affiliates or Issuers.

(2) Encourage, assist, participate, receive compensation for, induce, or attempt to induce any Client or prospective business or customer to terminate, surrender, redeem, or cancel any action related to Products and Services acquired or ordered from or through Company, Company's Affiliates, Issuers, or any employee or any other person selling or distributing Products or Services offered by the Company or its Affiliates;

(3) Employ or seek to employ any person who is at that time employed by Company or any other person selling or distributing Products and Services offered by the Company and its Affiliates, or otherwise directly or indirectly induce such person to leave his or her employment or Affiliation with Company without prior approval of Company.

(4) Solicit or receive compensation from or related to, any Clients that you contacted, serviced or learned about while operating under this Agreement or any Rider to this Agreement to open an account other than an Company account or to sell any investment, financial or insurance Products or Services to such Clients.

(5) Open an account for, receive compensation for, provide or offer to provide, or receive any compensation related to, any investment, financial, or insurance Products or Services to any Clients that you serviced or learned about while operating under this Agreement.

(6) Disparage Company, its affiliates, employees or any other person selling or distributing Products or Services offered by the Company or its Affiliates, advisors, and Products and Services. For purposes of this Section IV an "Issuer" is a company or entity that issues Products and Services distributed or offered by Company, Company's affiliates, or Company as the agent of another company.

(7) Disclose any trade secret or other proprietary information of Company or an Affiliate or Issuer or use any trade secret or other proprietary information in competition with Company or an Affiliate or Issuer.

(8) You understand and agree that information about Clients, including Client identities, is confidential information and a trade secret. This client information is the sole and exclusive property of Company or its Affiliates or Issuers.

2. "Using the Company Name and Logo"

(a) As long as this Agreement is in effect, you have a limited license to use the Company name and logo in advertising and in telephone directories or listings to indicate your association with the Company as a Financial Advisor. You must use the name or logo in line with the Company rules and policies. The Company is not obligated for any unauthorized costs connected with your use of the name or logo.

(b) When this Agreement ends, the Company has the exclusive right either to use or cancel the service of any such telephone number listed or to become listed in any directory or in any advertising that would associate the telephone number with the Company. You are responsible for executing and delivering to the Company the documents needed to transfer or cancel the service, without demand and without compensation.

3. "Violation of These Restrictions"

(a) You agree that:

(1) The violation of the provisions in this section will result in damage to the Company that cannot be determined exactly and for which the Company has no adequate remedy under the law; and that

(2) The Company has the specific right to enforce these provisions; and that

(3) The Company is entitled to an injunction to keep you from violating the provisions or to enforce them.

## Section V — Other Restrictions

(a) Sales Literature. You must have written approval from Company or an Affiliate before you issue or use in any way material about Products and Services distributed by Company, an Affiliate or Issuer or about them. You will also take steps to prevent and promptly advise Company of the use of unapproved material by an employee, Associate Vice President, Manager/Coach or any other person selling or distributing products and services offered by the Company and its affiliates.

(b) Trafficking or Switching. You will not make any agreement with any person for the repurchase or resale of Products or Services distributed or offered by Company, an Affiliate or Issuer. You also will not seek or purchase (except from Company, an Affiliate or Issuer) or traffic in any security of Company, an Affiliate or Issuer. You will not resort to "trafficking" in or "switching" of the securities of any other companies, of insurance policies or of governmental obligations. You will take steps to prevent and promptly advise Company of any such activity or practice on the part of an employee, Associate Vice President, Manager/Coach or any person selling or distributing Products and Services offered by the Company and its affiliates.

(c) You will not attempt to cancel or rescind any insurance policy, annuity contract or other Company product nor make any refunds to a policy or contract holder or make any settlement with a Client without the written approval of Company.

## Section VI — Termination

(a) This Agreement automatically terminates in the event of:

(1) Your death or retirement.

(2) Your total and permanent disability.

(3) Cancellation or non-renewal of any license, registration or bond you are required to have.

(4) A violation of any provision of this Agreement.

(b) Termination by Parties. This Agreement may be terminated by either party with or without cause at any time and for any reason. You agree that you are an employee-at-will of Company.

### Section VII — Termination Claims

If this Agreement ends, you have no claim for profits, anticipated profits or future earnings. You also have no claim for a refund or reimbursement of any funds you have advanced or expenses you have paid or incurred in connection with your responsibilities under this Agreement or for any other reason. The only exception will occur if Company specifically authorizes reimbursement in writing before termination of the Agreement.

### Section VIII — Prior Agreements

This Agreement terminates and supersedes any existing agreements between you and the Company. You understand you will have no right to participate in any benefit program, or receive any commissions, overwriting or other compensation payable under or pursuant to any prior agreement with the Company.

### Section IX — Miscellaneous

(a) This Agreement and any Riders to it may be amended only in writing. The amendment must be signed by an authorized officer of Company.

(b) The terms of this Agreement and any Riders to it are governed by Minnesota law.

(c) If Company waives any provisions of this Agreement, the waiver applies only to that provision, not to any other parts of the Agreement. A waiver is effective only when it is in writing and signed by an authorized officer of Company.

(d) If the laws of any state prohibit any provision of this Agreement, the laws apply only to that provision. They do not invalidate the remaining portion of the Agreement.

(e) Any notice to be given to you by Company is considered to have been given if delivered to you in person or mailed to your last known address on file with the Company corporate office in Minneapolis.

(f) You and Company both acknowledge that no oral or written representations were made about this Agreement or about the relationship between you and Company that are not set forth in this Agreement.

### Section X — Arbitration

1. You and the Company agree to arbitrate any dispute, claim or controversy that may arise between you and the Company or a customer or any other person ("Claims"), unless otherwise agreed to in writing by the parties. To the extent that such Claims are required to be arbitrated under the rules, constitutions, or by-laws of the National Association of Securities Dealers ("NASD"), as amended from time to time, they will be arbitrated in accordance with the policies and procedures established by the NASD.

2. If either the NASD declines to administer an arbitration of any Claims or the NASD rules do not allow for arbitration of any Claims, the parties agree that the Claims shall be finally decided by arbitration conducted pursuant to the Commercial Dispute Resolution Procedures of the American Arbitration Association ("AAA"), and its Supplementary Rules for Securities Arbitration, or the AAA National Rules for the Resolution of Employment Disputes, as applicable. In addition, you and the Company specifically agree that all Claims, statutory or otherwise, which allege discrimination, including but not limited to claims of sexual harassment, shall be finally decided by arbitration pursuant to the AAA unless otherwise agreed to in writing by the parties.

3. By agreement of the Parties in writing, disputes may be resolved in arbitration by a mutually agreed-upon organization other than the NASD or the AAA.

4. In consideration of the promises and the compensation provided in this Agreement neither you nor the Company shall have a right (a) to arbitrate any Claim on a class action basis or in a purported representative capacity on behalf of any Advisors, employees, applicants or other persons similarly situated; (b) to join or to consolidate in an arbitration Claims brought by or against another Advisor, employee, applicant or the Company, unless otherwise agreed to in writing by all parties; (c) to litigate any Claims in court or to have a jury trial on any Claims; and (d) to participate in a representative capacity or as a member of any class of claimants in an action in a court of law pertaining to any Claims. Nothing in this Agreement relieves you or the Company from any obligation you or it may have to exhaust certain administrative remedies before arbitrating any claims or disputes under this Policy.

5. Either you or the Company may compel arbitration of any Claims filed in a court of law. In addition, either you or the Company may apply to a court of law for an injunction to enforce the terms of this Agreement pending a final decision on the merits by an arbitration panel pursuant to this provision.

6. The Company shall pay all fees, costs or other charges charged by the NASD, AAA or any other organization administering an arbitration proceeding pursuant to these provisions that are above and beyond the filing fees of the federal or state court in the jurisdiction in which the dispute arises, whichever is less. You and the Company shall each be responsible for their own costs of legal representation, if any except where such costs of legal representation may be awarded as a statutory remedy by the arbitrator.

7. Any award by an arbitration panel shall be final and binding upon the parties. Judgment upon the award may be entered by any court having jurisdiction thereof or having jurisdiction over the relevant party or its assets.

8. This Agreement is covered and enforceable under the terms of the Federal Arbitration Act.

## Section XI — Effective Date

In witness of the provisions of this Agreement as described above, you and Company have entered into this Agreement with the understanding that it becomes effective on _____.
(Year)

Ameriprise Financial Services, Inc., its affiliated insurance agencies, IDS Life Insurance Company and IDS Life Insurance Company of New York

By _____

Its _____

_____
Advisor Signature

_____
Please Print Name

_____

A.O. Number

Advisor Number

Social Security Number

(To be executed in duplicate — one copy returned to Financial Advisor)

# AMERIPRISE FINANCIAL SERVICES, INC.
# INDEPENDENT ADVISOR BUSINESS
# FRANCHISE AGREEMENT

E.  To comply with regulatory requirements, Ameriprise Financial may make reasonable interpretations and revise the contents of the Manuals from time-to-time. For business changes to the Manuals, Ameriprise Financial will provide Independent Advisor with reasonable notice. Such revisions may include the introduction of new fees and revisions to any of the fees set forth in the Manuals, this Agreement, or the Uniform Franchise Offering Circular (including the Association Fee). Ameriprise Financial further agrees to provide Independent Advisor with 90 days' written notice of any non-regulatory changes which reduce the GDC (Gross Dealer Concession) Payout Rate as defined in such Manuals. Independent Advisor agrees to comply with the revised Manuals. Any notice of revision to the Manuals may be made by revising the Manuals and notifying Independent Advisor of such revisions by any reasonable means, including, but not limited to, electronic access as noted in this section.

F.  Independent Advisor agrees to ensure that the Manuals are kept current at all times. In the event of any dispute as to the contents of the Manuals, the terms of the most recently communicated Manuals supersede all previous Manuals.

10. CONFIDENTIAL INFORMATION

A.  Independent Advisor has had and/or may have access to Ameriprise Financial trade secrets and confidential information that Independent Advisor agrees has great value to Ameriprise Financial. Independent Advisor agrees that because of such access, Independent Advisor is in a position of trust and confidence with respect to this information. To protect Client confidentiality, Ameriprise Financial goodwill, trade secrets, and other proprietary and confidential business information, Independent Advisor agrees to not, during the term of this Agreement or thereafter, except as permitted under Section 14 regarding transfers of the Independent Financial Advisor Business, communicate, divulge, or use for himself or herself except pursuant to the System, or for the benefit of any other person, partnership, association, or corporation any confidential information, or trade secrets, including, without limitation, Client names, addresses and data and know-how concerning the methods of operation of the System and the business franchised hereunder which may be communicated to Independent Advisor or of which Independent Advisor may be apprised by virtue of Independent Advisor's operation under the terms of this Agreement. Independent Advisor also shall not reveal any information about potential clients to whom a presentation has been made by any Independent Advisor who might reasonably be expected to do business with Ameriprise Financial. Independent Advisor agrees to divulge such confidential information only to such of his or her employees as must have access to it in order to operate the Independent Financial Advisor Business. Except as otherwise permitted in Section 19, Independent Advisor agrees that, without limitation, Client names, addresses, data and other personal and financial information recorded in Client records are confidential. Confidential information includes compilations and lists of such Client information even if such compilations or lists were the result of substantial effort, time and/or money expended pursuant to the System. Independent Advisor further agrees to use this confidential information only in furtherance of this Agreement or in accordance with the Manuals and for no other purpose. Confidential information does not include information which is generally known outside of Ameriprise Financial other than as a result of a disclosure by Independent Advisor, Independent Advisor's agents or representatives, or any other person or entity in breach of any contractual, legal or fiduciary obligation of confidentiality to Ameriprise Financial or to any other person or entity with respect to such information.

B.  At Ameriprise Financial's request, Independent Advisor agrees to require any personnel having access to any confidential information of Ameriprise Financial or information about Clients or potential clients to execute covenants that they will maintain the confidentiality of information they receive in connection with their employment by or association with Independent Advisor in the Independent Financial Advisor Business. Such covenants shall be in a form satisfactory to Ameriprise Financial, including, without limitation, specific identification of Ameriprise Financial as a third-party beneficiary of such covenants with the independent right to enforce them.